IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAULETTE BILLIE & RONALD BILLIE, h/w, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| AUTISM SPEAKS, INC., | : | NO. 12-2261 |
| | : | |
| Defendant | : | |

**MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Baylson, J.                                                                                                    December 13, 2012

## I.  INTRODUCTION

Plaintiffs, Paullette and Ronald Billie, initiated this premises liability action against Defendant, Autism Speaks, Inc., for an injury Mrs. Billie suffered at a city park during one of Defendant's events.  Currently before the Court is Defendant's Motion for Summary Judgment.  Defendant argues that it cannot be liable for Mrs. Billie's injury since it did not possess the property where the injury occurred.  The Court will GRANT Defendant's motion because a reasonable fact-finder could not infer, based on the evidence in the record, that Defendant had possession of the park.  Although Plaintiffs assert a new theory of liability in their brief, this new theory has no viability under the circumstances of this case.

## II.  FACTS AND PROCEDURAL BACKGROUND

The Defendant, Autism Speaks, is a non-profit organization that raises funds for autism awareness and research.  One way Defendant raises funds is by holding "Walk Now for Autism" events where individuals are encouraged, but not required, to solicit donations for walking five kilometers.  Deposition of Paulette Billie ("Billie Dep.") at 69:6-9.  On April 16, 2011, Defendant held a "Walk Now for Autism" event that was attended by approximately 8,000 to

10,000 people at Lehigh Parkway in the City of Allentown.  During the event, Mrs. Billie fractured her right ankle when she stepped into a hole in a grassy hill where she parked.

Lehigh Parkway is owned, maintained, and regulated by the City of Allentown. Deposition of Jason Hertz ("Hertz Dep.") at 8-9; Deposition of Richard A. Holtzman ("Holtzman Dep.") at 9.  The City granted Defendant a permit to use the park on the day in question. Holtzman Dep. at 10-11.  In order to obtain this permit, Defendant was required to obtain insurance coverage for $1,000,000 and produce a certificate showing that the City of Allentown was included as an additionally insured party.  Ex. 1 at 6 to Holtzman Dep.

Under the permit, it is undisputed that Defendant "was required to follow the rules and regulations of the Lehigh Parkway . . . and in that connection, Lehigh Parkway was open to the public during the Walk."  Def's Mot. ¶ 11.  Richard A. Holtzman, the Superintendent of the Parks and Acting Director of Parks and Recreation, testified about the nature of Defendant's permit as follows:

> Q. And did the City of Allentown grant Autism Speaks Inc. the permission to use the Lehigh Parkway for the 2011 walk?
> A. Yes.
> Q. And in doing so was Autism Speaks required to follow the rules and regulations of the Lehigh Parkway?
> A. Yes.
> Q. Was the Lehigh Parkway open to the public during the walk?
> A. Yes.
> Q. In other words, could my client Autism Speaks keep anybody from doing their normal walk or run, fishing, any other activity that the park is open to?
> A. No.
> Q. How about dogs?  People walk dogs in the Lehigh Parkway, correct?
> A. Correct.
> Q. Could my client keep folks from doing that?
> A. No.

>   Q. How about streets? Are there streets where you can drive your car through the Lehigh Parkway where this walk was going to take place?
>   A. Yes.
>   Q. And could my client have closed those streets to the public?
>   A. No.
>   Q. Were any of them closed to the public during the walk if you know?
>   A. Not to my knowledge, no.

Id. It is also undisputed that the "[t]he City of Allentown Department of Parks and Recreation retained the right to regulate and control the Park by limiting the areas of the Park that could be used for the Walk and imposing limitations[1] on the activities that could take place." Def's Mot. ¶ 13.

On the day before the event, Jennifer Smith from Autism Speaks walked through the park with Jason Hertz (the Maintenance Foremen of the Parks Department). The significance of this walk-through is disputed by the parties, specifically whether the City expected Defendant to inspect for holes. Although there is conflicting evidence in the record, it tends to support Defendant's contention that the City held no such expectation. The evidence is as follows:

Jason Hertz, the Maintenance Foremen who went on the walk-through with Smith, answered "no" when asked if there was "any other purpose of your walk-through" besides "showing the folks from Autism Speaks as well as the parking folks where they could park and where the walk could take place?" Hertz Dep. at 57. Hertz also answered "no" when asked: "Is there any maintenance of this field that you as the maintenance foreperson expected Autism Speaks to do in preparation for the walk." Id. at 26. Elsewhere in his deposition, however, Hertz gave a somewhat different answer. When Plaintiffs' counsel asked, "you said you expected [Defendant] to do an inspection for safety, correct," Hertz answered "[s]ure. Yeah." Id. at 52.

---

[1] As set forth in the permit, "1. You may not solicit in an aggressive manner. . . . 2. You may not block pedestrian right-of-way, emergency vehicle access shall not be obstructed. 3. Do not obstruct streets or sidewalks." Def's Mot. ¶ 13.

3

Richard Holtzman, the park superintendent, testified that the City never asked, nor expected, the Defendant to inspect the park for safety prior to the event. Holtzman answered "no" when asked: "Are you aware of anything . . . that was told to Autism Speaks requiring them to inspect the parking areas before using them for the walk?" Holtzman Dep. at 14-15. Holtzman also answered "no" when asked: "Are you aware of anybody from your office warning[2] Autism Speaks that there were groundhog holes that people should be careful of?" Id. at 16. In addition, when asked "[d]id your department last year expect Autism Speaks to go through the park the day before looking for any holes, either whether they be sinkholes or groundhog holes, and fill them in," Holzman responded "I don't think we expect them to. I believe there was a meeting that they did a walk-through of the route, but that's about it." Id. at 23.

It is undisputed that the hole which Mrs. Billie stepped in was not discovered during the walk-through. It is not clear, however, that the hole even existed at that time. According to Hertz, the hole was probably not there on April 14 (one day before the walk-through) because it was large enough that it would have likely been discovered when a city employee cut the grass. Hertz Dep. at 24. Further, if the hole was made by a groundhog,[3] Hertz noted that it could have been made on the morning of the event, as they can be made in as little as one hour. Id. at 56.

On the day of the event, Defendant provided port-a-johns, tents, and food. The Defendant also utilized a band trailer, which it rented from the City. All of these items were removed from the park following the event.

---

[2] Hertz testified that, during his work as Maintenance Foremen, he had never seen groundhog holes in the field where Mrs. Billie was hurt. Id. at 13-14, 18-19.
[3] Based on its appearance and depth, Hertz did not believe the hole was made by a groundhog. He believed, instead, that it was man-made. Id. at 20-21.

On April 26, 2012, the Plaintiffs filed their Complaint against Defendant, alleging both negligence and consortium negligence. (ECF No. 1). Plaintiffs amended their Complaint on May 17, 2012, (ECF No. 4), to which the Defendant replied with an Answer, (ECF. No. 6). On August 24, 2012, Defendant filed its Motion for Summary Judgment on both claims. (ECF No. 15). In a telephone conference with the parties on December 12, 2012, the Court asked Plaintiffs' counsel to provide legal authority to support the contentions that Defendant (1) possessed the park and (2) assumed a duty of care to the event participants by going on the walk-through. (ECF No. 26). On December 13, 2012, Plaintiff submitted a supplemental letter addressing both issues. (ECF No. 27).

### III.   LEGAL BACKGROUND

#### A.   Jurisdiction

This Court has jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. §§ 1332(a) and (c). The Billies are Pennsylvania citizens who allege damages in excess of $75,000. Autism Speaks is a non-profit corporation organized under the laws of Delaware with a principal place of business in New York City. Venue is proper under 28 U.S.C. § 1391(b)(2).

#### B.   Summary Judgment

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Rule 56, the Court must view the evidence in the

light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

**C.      Pennsylvania Tort Law**

"In order for the party to be liable" in a premises liability case, "it must first be a 'possessor' of land."  Blackmun v. Federal Realty Inv. Trust, 664 A.2d 139, 142 (Pa. Super. 1995); see also Estate of Zimmerman v. Southeastern Pa. Transp. Auth., 168 F.3d 680, 684 (3d Cir. 1999) ("The duty to protect against known dangerous conditions falls upon the possessor of the land.").  The Pennsylvania Supreme Court has defined possession in accordance with the Restatement (Second) of Torts § 328E as "authority to manage the land and regulate its use." Stanton v. Lackawanna Energy, Ltd., 886 A.2d 667, 676 (Pa. 2005).  According to the Third Circuit, mere "use" of land "does not equate with possession" because "[a]ccess to land need not entail control over land."  Zimmerman, 168 F.3d at 685.  Even, however, where a party does own or possess land, the Pennsylvania Recreational Use of Land and Water Act ("RULWA") grants immunity from ordinary premises liability claims if the land is (1) open to the public, (2) used for recreational purposes, and (3) free of charge to users.  68 P.S. § 477-6(2); Stanton, 886 A.2d at 675.

Finally, where no duty is owed to a third party, a duty of care may be assumed by engaging in certain affirmative conduct.  Pennsylvania courts have adopted § 324A of the Restatement (Second) of Torts, which provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or

>   (b) he has undertaken to perform a duty owed by the other to the third person, or
>   (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Sheridan v. NGK Metals Corp., 609 F.3d 239, 263 (3d Cir. 2010) (quoting Restatement (Second) of Torts § 324A (1965)).

### IV. THE PARTIES' ARGUMENTS

Defendant provides two arguments for why its motion for summary judgment should be granted: First, it did not possess the property and thus it owed no duty of care to Mrs. Billie. Second, assuming *arguendo* that it did possess the property, it would qualify for immunity under RULWA.

In their brief opposing the motion, Plaintiffs did not argue that Defendant possessed the property. Instead, Plaintiffs focused almost entirely on Defendant's alternative theory that RULWA provides immunity if the Court finds possession.

Plaintiff's only substantive response regarding the possession issue is that, if Defendant did not have possession, it nevertheless assumed a duty of care (under § 324A of the Restatement) by inspecting the park for safety during the walk-through and taking out the $1,000,000 insurance policy. This is the first time Plaintiffs have raised this theory. In their Amended Complaint, Plaintiffs alleged negligence on the grounds that Defendant was an "occupier" of the park who was "required to use reasonable care in the maintenance and use of the land, and to protect invitees from foreseeable harm." Am. Compl. ¶ 11. Although Plaintiffs noted that liability under § 324A is "not presently before the Court," they nevertheless contend that it is a basis for rejecting Defendant's motion. Pl's Mem. at 4-5.

## V.     ANALYSIS

As discussed below, there is no evidence from which a reasonable fact-finder could infer that Defendant possessed the city park. This defect cannot be cured by resort to § 324A because the evidence in this case does not support Plaintiff's theory that Defendant assumed a duty of care to protect event participants from hazards on the premises.

### A.     Defendant Was Not in Possession of the Property

The evidence is clear that Defendant did not have "authority to manage the land and regulate its use," Stanton, 886 A.2d at 676, and thus did not possess the park. The undisputed facts show that: (1) the City of Allentown owns and maintains the park; (2) Defendant obtained a permit to use the park which required adherence to the City's rules and regulations; (3) Defendant did not modify the park other than by bringing in port-a-johns, tents, and a band trailer; and (4) Defendant had no authority to exclude the public from the park. Such facts are analogous to those at issue in Davis v. City of Philadelphia, 987 A.2d 1274 (Pa. Commw. Ct. 2010). There, the Pennsylvania Commonwealth Court held that a sports club with a permit to play soccer in a city field was not in possession of the field during the course of its weekly games because it "occupied the Field for only brief periods, approximately once a week; [it] did not modify the Field other than by painting lines on it; and the Field was used by other groups during the rest of the week." Davis, 987 A.2d at 1279. Under Davis, it is evident that Defendant did not possess Lehigh Parkway.

In their supplemental letter, Plaintiffs argue that possession in this case is a matter that should be left to a jury. The Court, which has carefully reviewed the legal authority cited by the Plaintiffs, finds no legal basis to support this contention. The few Pennsylvania cases cited in the

letter provide no basis for finding possession under the circumstances here.[4] Lacking any precedent from Pennsylvania courts, Plaintiffs rely primarily on four cases from other jurisdictions. Pl's Supp. Ltr. at 3 (citing Jarr v. Seco Constr. Co., 666 P.2d 392 (Wash. Ct. App. 1983); O'Shea v. Claude C. Wood Co., 97 Cal. App. 903 (1979); McLinn v. Kodiak Elec. Assoc., 546 P.2d 1305 (Ak. 1976); Isler v. Burman, 232 N.W.2d 818 (Minn. 1975)).[5] For the following reasons, however, these four cases do little to bolster Plaintiffs' position.

First, the O'Shea court directly contradicts Plaintiff's assertion that "the status as a licensee makes the licensee a possessor of land." Pl's Supp. Ltr. at 3. The O'Shea court states that "mere permission to use land, dominion over it remaining in the owner and no interest in or exclusive possession of it being given, is but a license . . . . Such a person has not the possession of the land . . . ." 97 Cal. App. at 909 (first alteration in original).

Second, possession was a question of fact in Jarr because the property owner testified that, on the day of plaintiff's injury, the defendant (a real estate company) "was in *complete charge* of the open house and *had the responsibility to control prospective purchasers viewing the property* and . . . was *in control of the site and buildings* as they related to the showing of certain units." 666 P.2d at 395 (emphases added). No analogous evidence of "complete" control exists in the instant dispute.

---

[4] The cited Pennsylvania cases simply demonstrate the general propositions that: (1) possession is normally a factual question for the jury, (2) title ownership is not a prerequisite for finding possession, and (3) possession can be demonstrated under a variety of circumstances.

[5] Based on these cases, Plaintiffs assert possession based on the following alleged facts: "[Defendant] had between 8,000 to 10,000 people walking at the park. They had about 6,000 vehicles in attendance and they set aside places for parking. They hired security guards appearing to be police under Chief Spang directing the flow of traffic. They actually put up traffic control devices to create a one-way loop of traffic. They brought in food and refrigerated trucks to keep the food cold. They had electric power for the refrigeration. They installed a bandstand and multiple tents and even a stand-by-ambulance to protect their invitees. They set up porta-johns. The City gave them a license, and for that one day, the Defendant not only intended to control the park, but they actually did." Pl's Supp. Ltr. at 2-3.

Third, the defendant in McLinn (a utility company installing a telephone poll alongside a public street) had authority to control the property (presumably because of an easement). See 546 P.2d at 1306-07. Although the plaintiff's injury occurred in the street adjacent to where the poll was being installed, the relevance of this scenario is questionable to the facts before this Court.

Finally, the Isler decision –although the most persuasive of the four cited cases—has been interpreted narrowly by Minnesota courts under circumstances analogous to those at issue here. See Hardwood Springs Christian Ranch, Inc. v. Walk to Emmaus, 801 N.W.2d 193, 198 (Minn. Ct. App. 2011). In Isler, the Minnesota Supreme Court found sufficient evidence of possession where the defendant church planned, organized, and supervised a snowmobile party on the premises of a private farm that the church was given permission to use. 232 N.W.2d at 821. The Isler court found possession, in part, because prior to the party, the church had inspected the property for hazards and had "assured those involved that the party would be supervised and chaperoned by the church." Id.

Although it is unclear what significance Pennsylvania courts would give to the Isler court's holding, Minnesota courts have interpreted it narrowly under conditions more analogous to the present facts. In Hardwood Springs, the defendant was an organization that rented a facility for a women's retreat. 801 N.W.2d at 195. At issue was whether the defendant was liable for an injury that occurred when a retreat participant slipped and fell on a patch of ice on the facility's premises. Id. at 196. The court held that the organization was not liable because, under its contract with the facility, it "was not obligated to perform any maintenance or to sand, salt, or clear ice from the premises." Id. at 198. As the court noted, the responsibility for maintaining the premises remained with the facility during the entirety of the retreat. Id. Since

the circumstances in Hardwood Springs are more analogous to the instant dispute than the circumstances in Isler, the Isler decision provides limited support for Plaintiffs' argument, and certainly not enough to warrant this Court, sitting in diversity, to infer that Pennsylvania courts would apply it to the case at bar.

**B.     No Liability Under § 324A of the Second Restatement**

Although Plaintiffs argue that Defendant might be liable under § 324A, they cite no case law, nor otherwise attempt to demonstrate the existence of a genuine dispute of material fact. Plaintiffs merely offer the conclusory statement that Defendant "assumed [a duty of care under § 324A] by inspection for safety of its guests" and taking out the insurance policy. Pl's Mem. at 4; Pl's Answer to Def's Mot. ¶ 15. As discussed below, § 324A does not provide a viable basis for relief under the circumstances here because (1) there is no genuine factual dispute that the risk was foreseeable; (2) there is no genuine factual dispute that Defendant engaged in an affirmative undertaking to prevent the risk; and (3) the mere fact Defendant purchased an insurance policy is of dubious relevance.

**1.     Foreseeability of Risk**

According to the Pennsylvania Supreme Court, "if there was no reason that the defendant should have foreseen that his actions were necessary for the protection of the plaintiff, no cause of action will lie under § 324A." Cantwell v. Allegheny Cnty., 483 A.2d 1350, 1354 (Pa. 1984). Here, there is no evidence that Defendant "should have foreseen" that failing to inspect the entire premises, let alone the specific area where Mrs. Billie was injured, was necessary for protecting event participants. According to Holtzman, the City neither warned Defendant about the existence of holes, nor asked Defendant to inspect for them. Further, according to Hertz, he had never seen groundhog holes in the field where Mrs. Billie was injured. Since there is no

evidence the City warned Defendant about the holes or asked Defendant to look for them, there is no genuine factual dispute that the risk was foreseeable.[6]

## 2.     An Affirmative Undertaking

According to the Third Circuit, "for liability to be imposed under § 324A, 'the defendant specifically [must have] undertaken to perform the task that [it] is charged with having performed negligently.'" Sheridan, 609 F.3d at 263 (quoting Patentas v. United States, 687 F.2d 707, 716 (3d Cir. 1982)); see also Sound of Market St, Inc. v. Continental Bank Int'l, 819 F.2d 384, 392 (3d Cir. 1987) ("[W]e have found no Pennsylvania case that has imposed liability in the absence of both *affirmative conduct* and physical injury." (emphasis added)).

Here, there is nothing in the record to indicate that Defendant understood the purpose of the walk-through to be for safety purposes. According to Hertz, the only two purposes of the walk-through were to show Defendant where event participants could park and where the Walk would take place. Although Hertz testified that he personally expected Defendant to inspect the premises for safety, this subjective expectation does not establish the Defendant's own understanding. Since there is no evidence that Defendant knew the walk-through was for safety purposes, it is difficult to characterize the walk as an affirmative undertaking "to render services to [the City] which [Defendant] should [have] recognize[d] as necessary for the protection of a third person or his things . . . ." Sound of Market Street, 819 F.2d at 392 (quoting Restatement (Second) of Torts § 324A (1965)).

---

[6] This Court addressed a similar incident in Carter v. United States, No. 10-2927, 2011 WL 6812868 (E.D. Pa. Dec. 27, 2011) (Baylson, J.). Under the reasoning of Carter, there is no basis in the current record from which to reasonably infer that (1) Defendant had constructive notice of the hole or (2) Defendant failed to exercise reasonable care by failing to discover a single hole in an expansive park. See 2011 WL 6812868, at *3-6.

### 3.     Insurance Policy Has Little Apparent Relevance

Finally, Plaintiffs do not provide any authority or explanation to support their contention that Defendant's purchase of the insurance policy subjects it to § 324A liability.  On its face, the contention makes little sense.  Liability under § 324A requires that the *negligent* undertaking of an affirmative act *cause* the Plaintiff's injury.  See Patentas, 687 F.2d at 717 ("[T]he language of the Restatement assumes that the injuries result in fact from the defendant's negligent performance of his or her undertaking . . . .").  Even assuming that purchasing an insurance policy is an "affirmative" undertaking for purposes of § 324A, there is no evidence that Defendant was negligent in doing so, nor can it be said that Defendant's purchase of the insurance caused Mrs. Billie's injury.

## VI.    CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment will be GRANTED.  The case will therefore will be DISMISSED.

An appropriate order follows.